UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| JUAN GALINDO, | ) | No. ED CV 10-01101-VBK |
| | ) | |
| Plaintiff, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| v. | ) | |
| | ) | (Social Security Case) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court for review of the decision by the Commissioner of Social Security denying Plaintiff's application for disability benefits.  Pursuant to 28 U.S.C. §636(c), the parties have consented that the case may be handled by the Magistrate Judge.  The action arises under 42 U.S.C. §405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the Administrative Record ("AR") before the Commissioner.  The parties have filed the Joint Stipulation ("JS"), and the Commissioner has filed the certified AR.

Plaintiff raises the following issues:

1.   Whether  the  Administrative  Law  Judge  ("ALJ")  erred  in

1          finding at Step Two that Plaintiff's depression does not

2          amount to a legally severe impairment; and

3     2.   Whether the ALJ erred in rejecting the opinions of treating

4          orthopedist Ahmed and granting controlling weight to the

5          opinions of one-time examining physicians.

6  (JS at 5.)

7

8      This Memorandum Opinion will constitute the Court's findings of

9  fact and conclusions of law.  After reviewing the matter, the Court

10 concludes that for the reasons set forth, the decision of the

11 Commissioner must be reversed.

12

13                                    **I**

14        **THE ALJ ERRED IN REJECTING TREATING AND EXAMINING**

15 **PHYSICIANS' OPINIONS REGARDING PLAINTIFF'S MENTAL IMPAIRMENT**

16     Plaintiff asserts that the ALJ erred in finding that Plaintiff

17 does not have a legally severe mental impairment at Step Two of the

18 sequential evaluation process (the sequential evaluation process is

19 explained in the ALJ's decision at AR 15-17).  For the reasons to be

20 set forth below, the Court agrees.

21     In his decision, the ALJ determined that Plaintiff's medically

22 determinable impairment of depression does not cause more than minimal

23 limitation in his ability to perform basic mental work activities, and

24 is therefore non-severe. (AR 17.)

25

26     **A.   Applicable Law**.

27     In evaluating mental impairments, 20 C.F.R. §404.1520a(c)(3)(4)

28 and §416.920a(c)(3)(4) mandate that consideration be given, among

other things, to activities of daily living ("ADLs"), social functioning; concentration, persistence, or pace; and episodes of decompensation.  These factors are generally analyzed in a Psychiatric Review Technique Form ("PRTF").  The PRTF is used at Step Three of the sequential evaluation to determine if a claimant is disabled under the Listing of Impairments; however, the same data must be considered at subsequent steps unless the mental impairment is found to be not severe at Step Two.  <u>See</u> SSR 85-16.

The GAF scale is intended to reflect a person's overall level of functioning at or about the time of the examination, not for a period of at least 12 consecutive months, which is required for a finding of impairment or disability. (<u>See</u> 20 C.F.R. §§416.905, 416.920(c)(2006).)

GAF scores are intended to be used for clinical diagnosis and treatment, and do not directly correlate to the severity assessment set forth in Social Security regulations. (<u>See</u> Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000), and American Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revision</u> 33 (4th Ed. 2000).

Step Two of the well-known sequential evaluation process has been characterized as, essentially, a "<u>de</u> <u>minimis</u> screening device to dispose of groundless claims." <u>Smolen v. Chater</u>, 80 F.3d 1272, 1290 (9th Cir. 1996).

**B.** **<u>Analysis</u>**.

Plaintiff's mental state has been evaluated by five sources of record, which the Court will discuss in turn.  First, on May 24, 2006, Plaintiff was evaluated by psychologist Paul Whitaker, in connection

with a workers' compensation claim. (AR 280-300.)  Dr. Whitaker performed a clinical examination (AR 284-85), and also administered standardized psychological tests (AR 287-88).  Dr. Whitaker made no conclusions that Plaintiff was either malingering or exaggerating. (AR 284-299.)  He concluded that as a result of his testing, Plaintiff presented with the diagnostic impression of Major Depressive Disorder, Single Episode - Severe, under the Diagnostic and Statistical Manual ("DSM") heading of DSM IV: 296.23. (AR 297.)  Dr. Whitaker noted that Plaintiff's symptoms had persisted, some with even greater intensity and that his condition has caused him to be temporarily totally disabled on a psychological basis. (Id.)  In a section entitled "Conclusions and Recommendations," Dr. Whitaker noted that, "the severity and duration of [Plaintiff's] symptoms have seriously interfered with most major life and personal functions... [Plaintiff] now has trouble concentrating on virtually any given task at hand, and his functioning is impaired due to the above-described symptoms." (AR 298.)

The ALJ considered Dr. Whitaker's opinion but gave "limited probative weight to his assertions." (AR 24.)  The ALJ focused on the GAF score of 54, finding it was of limited evidentiary value. While the Court agrees with this portion of the ALJ's assessment, the ALJ then goes on to indicate that while he gives more weight to the objective details and chronology of the record, they demonstrate that Plaintiff's symptoms have improved with treatment.  The ALJ failed to provide any citations to the record to prove that point, and the Court has not found that this conclusion is consistent with the record. Further, the ALJ cited Plaintiff's activities of daily living ("ADL"), including "taking care of his own personal needs as well as taking

care of his son, performing household chores, shopping, and transacting business using a computer, certainly belying 'more than mild difficulties in any areas of mental functioning." (AR 24.) These reasons, however, do not meet the test of providing a specific and legitimate rationale for rejecting Dr. Whitaker's opinion. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1996). Finally, the ALJ determined to reject Dr. Whitaker's opinion on the basis that there is no objective evidence to support Dr. Whitaker's conclusion that Plaintiff has moderate limitations in some areas of mental functioning. (Id.) The Court cannot find any factual basis for this conclusion, in that Dr. Whitaker performed substantial and standardized psychological testing. Moreover, the ALJ's statement is somewhat baffling, as the Court's discussion will demonstrate, because he relied upon other professional opinions which were asserted without the benefit of any objective testing, other than a bare mental status examination. (See, infra.)

As to Plaintiff's ADLs, relied upon by the ALJ to discredit Dr. Whitaker, this evidence simply does not meet the applicable test. Such things as performing undefined household chores, or tending to personal needs, or driving his son to school, do not impact upon Plaintiff's mental state. As is often and correctly stated, a claimant need not be vegetating in a corner in order to be found to have a disabling mental condition.

Thus, the ALJ's rejection of Dr. Whitaker's opinion, on the bases set forth in his decision, is simply incorrect.

On March 6, 2007, Plaintiff received a psychiatric evaluation from Dr. Adeyomo (AR 390-92.) After performing a mental status examination, Dr. Adeyomo diagnosed major depressive disorder by

history on Axis I. (AR 391.)

In his decision, the ALJ gave "significant weight" to Dr. Adeyomo's opinion, finding that it is "not inconsistent with the overall medical evidence that [Plaintiff] has no more than mild mental limitations." (AR 24.) But, again, there are significant problems with this analysis, which renders it insufficient on review. First, Dr. Adeyomo's opinion is not consistent with most of the mental health evidence in the record. Second, the ALJ's inconsistency in his evaluation process is troubling. As noted, the ALJ determined to reject Dr. Whitaker's opinion because he believed that Dr. Whitaker had no objective evidence to support his assessment of mental health symptoms. Thus, it would be reasonable to expect a similar standard of review by the ALJ with regard to other opinions, including Dr. Adeyomo's. Yet, Dr. Adeyomo did nothing more than conduct a brief mental status examination, which took up six lines in his evaluative report (AR 391). Indeed, the entire report is barely more than two pages long, and seems to be the result of a quick but not thorough examination. Moreover, Dr. Adeyomo's report fails to address relevant and significant areas of mental functioning required for a thorough analysis of mental impairments in the Social Security context. (See, "Applicable Law" section, supra.)

On March 22, 2007, Dr. Amado, a non-examining State Agency psychiatrist, assessed "moderate" limitations in Plaintiff's ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday or workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without rest periods of unreasonable length or frequency, and to respond appropriately to changes in the

work setting. (AR 417-18.)

The ALJ assessed that there was no evidence to support the moderate limitations that Dr. Amado provided. (AR 24.)  The ALJ again relied upon an unsupported assessment that Plaintiff's symptoms improve with treatment, and that his ADLs belie more than moderate difficulties in areas such as concentration, persistence and pace. (AR 24-25.)  Again, reliance on these factors is misplaced in this record. Moreover, the ALJ erred in determining that the consultative examiner ("CE"), Dr. Adeyomo, found that Plaintiff has no functional limitations. (Id.)  Again, the Court finds that the ALJ's reasons for rejecting Dr. Amado's opinion do not withstand appellate scrutiny.

On November 14, 2008, Plaintiff was examined by psychologist Shirley Simmons, at the request of the Department of Social Services. (AR 522-25.)  Dr. Simmons did not review any existing medical records. (AR 523.)  On Axis I, Dr. Simmons assessed "malingering." (AR 525.)

The ALJ undertook a detailed summary of Dr. Simmons' findings, and concluded that he would give them significant weight as they were consistent with the "overall medical evidence." (AR 25.)

If there were an absence of other mental health evidence, the Court would have no difficulty sustaining the ALJ's mental health findings, including his adoption of Dr. Simmons' findings.  But, as noted, the ALJ's rejection of the opinions of other, prior examining physicians is not based on the correct standards, and his rejection of the psychiatric report of Dr. Zodkevitch, to be discussed below, only lends further support to the Court's conclusion that the ALJ's analysis of Plaintiff's mental state does not represent an interpretation of evidence which is susceptible of more than one rational interpretation, as the Commissioner argues.  Rather, there is

1  an  absence  of  specific  and  legitimate  reasons  for  rejecting
2  contradictory opinions.

3      Plaintiff was examined by psychiatrist Dr. Zodkevitch upon the
4  referral  of  his  attorney,  who  both  represented  him  at  the
5  administrative level, and represents him in this case. (AR 502-13.)
6  Dr. Zodkevitch's examination occurred on December 9, 2008.  Medical
7  records were reviewed, and a mental status examination was performed.
8  (AR 507-08.)  Dr. Zodkevitch also administered standard psychological
9  tests (AR 508) and diagnosed Major Depressive Disorder, moderate to
10 severe;  Generalized  Anxiety  Disorder;  and  Psychological  Factors
11 Affecting Medical Condition. (AR 509.)  Dr. Zodkevitch found "marked"
12 limitations in a substantial number of areas relevant to the Social
13 Security analysis. (AR 517-19.)

14     The ALJ took particular aim at Dr. Zodkevitch's conclusions. (AR
15 25.)   First, he  gave  more weight  to opinions  of the  consultative
16 examiners which to him indicated a diagnosis of malingering, despite
17 the fact that only Dr. Simmons made such an explicit finding. (Id.)
18 The Court has particular concern with the ALJ's rejection of Dr.
19 Zodkevitch's opinion because of his explicit rationale that he is not
20 a treating source, "but, rather, the [Plaintiff] was sent to him for
21 assessment  by  his  attorneys.  Therefore,  the  specter  of  bias  in
22 relation to this opinion has been created and consequently, impeaches
23 the credibility of this assessor's opinion." (Id.)  The Commissioner
24 attempts to substantiate this rationale, citing the case of Saelee v.
25 Chater, 94 F.3d 520, 523 (9th Cir. 1996) for the proposition that where
26 a doctor's opinion is solicited by a plaintiff's counsel, "that fact
27 may be used in conjunction with other evidence in the record to
28 question the doctor's credibility and disregard the opinion." (JS at

22.)  But this is a constricted and inaccurate reading of the Saelee opinion.  In that case, there was other evidence beside the fact that the doctor was retained by Plaintiff's counsel to support an adverse credibility determination.  In particular, the Circuit found that the ALJ was justified in finding that the doctor's opinion was worded in such a way as to constitute an effort to assist a patient, even though there was no objective medical basis for the opinion. (See Saelee, 94 F.3d at 523.)  But here, no such finding was made.  Rather, the ALJ simply rejected Dr. Zodkevitch's opinion because of the reason that Dr. Zodkevitch was retained by Plaintiff's attorneys.  As such, the ALJ's basis for this credibility finding, if sustained, would have a chilling effect on the ability of a claimant to solicit a medical opinion.  Indeed, in this case, Plaintiff's counsel may well have been concerned by the fact that despite the existence of reports by examining mental health professionals that would support a finding of a severe impairment, the ALJ nevertheless sent Plaintiff out to Dr. Simmons for yet another evaluation.  It is the job of an attorney to marshal evidence in support of his client and his client's case.  If there is reason to doubt the credibility of an examining source, that may be provided by evidence in the record which must be something in addition to the mere fact that a medical professional was retained by Plaintiff's counsel.  Indeed, the ALJ's conclusion that Dr. Zodkevitch may be biased because he was retained by Plaintiff's attorneys raises a concern on the Court's part that the ALJ undertook here to reject opinions inconsistent with his conclusions, rather than evaluating all of the evidence, and then reaching a conclusion.  Indeed, this Court has seriously considered requiring that this matter be reassigned to a different ALJ upon remand, but will decline to take that unusual

step in this case, in the hope that on remand, the ALJ will adhere to the Court's instruction that all of the evidence, including mental health evidence, will be evaluated from an objective point of view.

## II

### THE ALJ COMMITTED ERROR IN REJECTING THE OPINION

### OF TREATING ORTHOPEDIST DR. AHMED

In Plaintiff's second issue, he contends that the ALJ erred in rejecting the opinion of his treating orthopedist, Dr. Ahmed. The record indicates that Dr. Ahmed examined Plaintiff on 11 occasions between September 2005 and October 2006, and then again in September of 2008. Dr. Ahmed diagnosed cervical strain with disc lesions and herniations and radiculopathy; lateral epicondylitis of the right elbow, and right shoulder impingement syndrome. (AR 370, 358-59, 355, 350, 345, 340, 335, 330, 325, 320, 314, 489-93.) On July 26, 2007, Dr. Ahmed filled out an questionnaire in which he indicated that due to Plaintiff's cervical spine disc lesion, shoulder impingement, epicondylitis with right hand tendinitis, anxiety, depression, and insomnia secondary to the depression, Plaintiff could sit eight hours, stand/walk eight hours, lift or carry no more than five pounds frequently and up to 20 pounds occasionally, and that he would be capable of tolerating no more than a low stress work environment and would likely need to take five to ten minute breaks every half hour. (AR 479-84.)

The ALJ rejected Dr. Ahmed's opinions. He found that the limitations Dr. Ahmed assessed "are not supported by the overall medical evidence," and thus gave only "limited probative weight" to his opinion. (AR 22.)

1    The Court must determine whether the ALJ's rejection of Dr.
2  Ahmed's opinion is supported by specific and legitimate reasons set
3  forth in the record.  For the reasons to be discussed, the Court finds
4  that the ALJ's decision falls short of the mark.

5    First, the ALJ claimed that Dr. Ahmed erred with regard to his
6  assessment of Plaintiff's limitations in cervical range of motion. (AR
7  22.)   But, as Plaintiff's counsel correctly notes, Dr. Ahmed's
8  objective examinations demonstrated that Plaintiff had limited ranges
9  of neck motion on 8 of his 11 examinations. (AR 313, 325, 329-30, 334-
10 35, 354-55, 349-50.)   In addition, Dr. Ahmed found positive
11 neurological signs including positive cervical compression tests (AR
12 320, 334-35, 354-55, 349-50, 339); shoulder impingement tests (AR 320,
13 340, 335); and finally, findings of spasms. (AR 334-35, 344, 325.)

14   The ALJ also addressed what was denominated Plaintiff's right
15 upper extremity impairment, finding a contradiction between other
16 doctors (Rao, Montgomery, and Yeh) and Dr. Ahmed, in that the former
17 doctors had released Plaintiff to return to work after treatment. (AR
18 22.)   While Plaintiff was released to work in May 2005 after
19 undergoing treatment for a right elbow injury (AR 250-260), that
20 particular injury and treatment occurred prior to his July 2005
21 disability onset, including his assertions of right shoulder
22 impingement.

23   Finally, the ALJ assessed, similarly to his mental health
24 discussion, that Dr. Ahmed's notes reflected an improvement in
25 Plaintiff's condition with no more than routine and conservative care.
26 (AR 22.)  But the 11 chart notes over a 13-month course of treatment
27 do not, in fact, so indicate.  During numerous of those examinations,
28 Dr. Ahmed found positive clinical findings which included impingement

signs in his shoulder, spasms, and a restricted range of motion in his neck along with positive cervical compression signs. (AR 313-360.) Indeed, in October 2006, a more recent cervical MRI reflected a possible worsening of the cervical condition. (AR 314.)  The initial MRI of the cervical spine indicated a disc protrusion at C5-6 (AR 358), but a later 2006 MRI indicated disc protrusions at four cervical levels and two thoracic levels. (Ar 375-77.)  As a result, Plaintiff received increased treatment, which included cervical epidural injections, cervical traction, pain management referral, and increased dosages of pain relieving anti-inflammatory and other medications. (AR 315.)  This evidence does not square with the ALJ's conclusion that Plaintiff was essentially getting better as time went on.

The ALJ's reliance on the results of consultative examinations by orthopedists Drs. Sophon and Dorsey (AR 22-23, citing AR 527-31, 393-97) is not adequate unless the rejection of Dr. Ahmed's opinion is supported by specific and legitimate reasons.  The ALJ may not simply pick one doctor's opinion over another without providing a correct and factually based analysis to support his conclusion.  Similarly, the ALJ's reliance upon the testifying medical expert ("ME") does not cure the problem.  Certainly, the ME, by definition, did not examine Plaintiff, but looking at some of his conclusions rendered during his testimony, there is substantial question as to the accuracy of his analysis.  For example, Plaintiff's attorney asked whether Plaintiff would have any restriction in regard to his neck movement, and the doctor answered, "Not really, no." (AR 34.)  Clearly, this does not account for the repetitive instances of substantial cervical restriction which were documented over a lengthy period of time by treating source Dr. Ahmed.

On remand, this medical evidence must be reevaluated pursuant to appropriate and proper standards.

For the foregoing reasons, this matter will be remanded for further hearing consistent with this Memorandum Opinion.

**IT IS SO ORDERED.**


DATED: April 5, 2011                    /s/
                              VICTOR B. KENTON
                              UNITED STATES MAGISTRATE JUDGE

13